UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————

DAVID MCKAY,

                    Plaintiff,              13 Civ. 2948 (JGK)

          - against -                       OPINION AND ORDER

THE CITY OF NEW YORK, ET AL.,

                    Defendants.
—————————————————————————

JOHN G. KOELTL, District Judge:

     Plaintiff David McKay brings this action against the City
of New York ("the City"), Michael Bloomberg, Raymond Kelly, and
Officer Harry Perez, alleging false arrest, false imprisonment,
and malicious prosecution under 42 U.S.C. § 1983.[1]  On June 1,
2012, Defendant Perez arrested the plaintiff for trespass after
Perez and other officers encountered the plaintiff in the
vestibule of an apartment building at 105 Charles Street in
Manhattan.  The plaintiff was held in custody for approximately
three hours, and then released.  On June 21, 2012, Perez signed
a criminal complaint charging the plaintiff with criminal
trespass.  The plaintiff made multiple court appearances before
the charge was dismissed on speedy trial grounds.  In this
action, the plaintiff alleges that he was arrested and
prosecuted without probable cause, and that his prosecution was

_____

[1] The Complaint contains an additional cause of action styled as
a claim for the deprivation of due process and equal protection,
but the plaintiff has withdrawn this claim.

motivated by malice.  Presently before the Court is the
defendants' motion for summary judgment dismissing the
plaintiff's claims.  For the reasons explained below, the
defendants' motion is granted.


                              I.

    The standard for granting summary judgment is well
established.  "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322 (1986).  "[T]he trial court's task at the summary
judgment motion stage of the litigation is carefully limited to
discerning whether there are any genuine issues of material fact
to be tried, not to deciding them.  Its duty, in short, is
confined at this point to issue-finding; it does not extend to
issue-resolution."  Gallo v. Prudential Residential Servs. L.P.,
22 F.3d 1219, 1224 (2d Cir. 1994).  The moving party bears the
initial burden of "informing the district court of the basis for
its motion" and identifying the matter that "it believes
demonstrate[s] the absence of a genuine issue of material fact."
Celotex, 477 U.S. at 323.  The substantive law governing the
case will identify the material facts and "[o]nly disputes over

                               2

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)); <u>see also</u> <u>Gallo</u>, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. <u>See</u> <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994); <u>see also</u> <u>Perez v. Duran</u>, 962 F. Supp. 2d 533, 535-36 (S.D.N.Y. 2013).

II.

Unless otherwise noted, the following facts are not in dispute.

A.

Plaintiff McKay is a professional musician who resides in New York. (Aff. of David McKay ("McKay Aff.") ¶ 2; Compl. ¶ 2.)

Defendant Perez is a New York City police officer who was assigned to the Sixth Precinct in Manhattan during the events relevant to this action.  (Compl. ¶ 6.)  Defendant Bloomberg was the Mayor of New York City and Defendant Kelly was the Police Commissioner of New York City when the relevant events occurred. (Compl. ¶¶ 4, 5.)

B.

At approximately 3:00am on the evening of June 1, 2012, the plaintiff finished a performance at the Fat Cat Club in Manhattan.  (See McKay Aff. ¶ 2.)  After the performance, the plaintiff met a woman at a deli, left the deli with her, and had a conversation with her while sitting on the steps in front of the entrance of the residential building at 105 Charles Street. (McKay Aff. ¶ 2.)  The conversation lasted approximately an hour and a half.  (McKay Aff. ¶ 3.)  After the conversation, the woman left.  (McKay Aff. ¶ 3.)  The plaintiff alleges that sitting on the steps had exacerbated an existing back injury, and that in order to relieve his back pain he entered the vestibule of the building at 105 Charles Street and sat down with his back against the wall.  (Decl. of Tobias E. Zimmerman in Supp. of Defs.' Mot. for Summ. J. ("Zimmerman Decl."), Ex. E ("McKay Dep.") at 6; McKay Aff. ¶ 3.)

4

The vestibule was separated from the street by four or five steps, and the door to the vestibule was unlocked.  (McKay Aff. ¶¶ 2-4; McKay Dep. at 25; <u>see also</u> Zimmerman Decl., Ex. F.)  The vestibule contained an "intercommunication device whereby persons seeking entrance to the secure part of the building could be admitted by response by tenants."  (McKay Aff. ¶ 4.)  It did not contain any posted "no trespassing" sign.[2]  (McKay Aff. ¶ 13.)

C.

At 4:51am on June 1, 2012, a 911 operator received a call from a female caller who reported that a man was sleeping in the doorway of the building at 105 Charles Street.  (<u>See</u> Zimmerman Decl. ¶ 5 & Ex. D.)  Defendant Perez and other officers from the Sixth Precinct responded to this call and arrived at 105 Charles Street at 4:52am.  (<u>See</u> McKay Dep. at 37-38; Zimmerman Decl. ¶ 5 & Ex. D.)  The plaintiff alleges that he had been in the vestibule for about ten minutes before the officers arrived.

---

[2] The lack of a "no trespassing" sign in the vestibule is a disputed fact, which some evidence in the record tends to contradict.  (<u>See</u> Zimmerman Decl., Ex. H.)  For purposes of the present motion, the facts must be construed in the light most favorable to the non-moving party, and the Court therefore assumes that there was no "no trespassing" sign in the vestibule.

(McKay Aff. ¶ 5.)  When the officers arrived, the plaintiff's eyes were closed.  (McKay Dep. at 27.)  The officers knocked on the door and pushed at the door.  (McKay Dep. at 27.)  The door pushed against the plaintiff's leg.  (McKay Dep. at 27.)  The plaintiff then got up and opened the door.  (McKay Aff. ¶ 5; McKay Dep. at 27.)  The officers questioned the plaintiff about drug dealing activities, which the plaintiff denied, and the officers then handcuffed the plaintiff, placed him under arrest, and escorted him to the Sixth Precinct station, which is located across the street from 105 Charles Street.  (McKay Aff. ¶ 6; McKay Dep. at 6; Zimmerman Decl. ¶ 6.)  At the station, the plaintiff was fingerprinted, photographed, and placed in a holding cell.  (McKay Aff. ¶ 7; McKay Dep. at 12, 74.)

Defendant Perez completed and signed an arrest Report that indicates that the plaintiff was arrested at 5:03am for trespass, a violation under New York Penal Law § 140.05.  (See Zimmerman Decl., Ex. B.)  The plaintiff spent approximately three hours in custody, and was then issued a Desk Appearance Ticket and released.  (McKay Aff. ¶ 8; Zimmerman Decl., Ex. C.)  The Desk Appearance Ticket listed New York Penal Law § 140.05 as the offense charged and required the plaintiff to appear in New York County Criminal Court on July 9, 2012 to answer the charge.  (Zimmerman Decl., Ex. C.)  It did not impose any travel

restrictions on the plaintiff.  (See Zimmerman Decl., Ex. C; see also McKay Dep. at 21-22.)


                              D.

     On June 21, 2012, Defendant Perez signed a criminal complaint charging the plaintiff with criminal trespass in the second degree, a misdemeanor under New York Penal Law § 140.15. (See Zimmerman Decl., Ex. H.)  The complaint states that Perez "observed [the plaintiff] inside the vestibule of a dwelling, an apartment building where people reside, at [105 Charles Street], laying down and sleeping, and . . . said location is beyond a posted sign which read, NO TRESPASSING."  (Zimmerman Decl., Ex. H.)  It further states that the plaintiff is not a tenant at 105 Charles Street, and that the plaintiff was unable to provide the name of a resident who had invited him onto the premises. (Zimmerman Decl., Ex. H.)  Finally, it states that Perez

     determined that [the plaintiff] did not have permission or
     authority to be inside the dwelling based on information
     and belief the source of which is as follows: [Perez] is
     informed by Joseph Jackson, of an address known to the
     District Attorney, that [Jackson] is an agent of this
     dwelling and [the plaintiff] did not have permission or
     authority to enter or remain in the area in which he/she
     was found.

(Zimmerman Decl., Ex. H.)

                              7

On July 11, 2012, Jackson signed a "supporting deposition" pursuant to New York Criminal Procedure Law § 100.20 affirming that the facts attributable to him in the June 21, 2012 criminal complaint were true.  (Zimmerman Decl., Ex. I.)  Beneath his signature on the printed form, Jackson hand-wrote the following:

> I am the owner of 105 Charles Street.  It is true that the [plaintiff] did not have permission or authority to enter and remain in the vestibule of my building.  However I did not speak to a police officer regarding this matter.

(Zimmerman Decl., Ex. I.)


                                    E.

When the plaintiff appeared before a New York County Criminal Court judge on July 9, 2012 pursuant to the Desk Appearance Ticket, the plaintiff rejected a plea offer from the prosecution.  (See McKay Aff. ¶ 13; McKay Dep. at 17-18.)  The plaintiff then made four additional court appearances—on August 23, October 15, November 7, and November 30, 2012—before the charge against him was dismissed on speedy trial grounds.  (See McKay Aff. ¶ 13; McKay Dep. at 22; Zimmerman Decl., Ex. J, Ex. K.)  No travel restrictions were imposed on the plaintiff at any time in connection with the charge against him.  (See McKay Dep. at 21-22.)

F.

The plaintiff filed this lawsuit on May 2, 2013, claiming false arrest, false imprisonment, and malicious prosecution against Defendants Perez, Kelly, Bloomberg, and the City.  The defendants now move for summary judgment on all claims.


III.

The plaintiff asserts claims for false arrest and false imprisonment under 42 U.S.C. § 1983.  In New York, false arrest and false imprisonment "are two names for the same tort." Biswas v. City of New York, 973 F. Supp. 2d 504, 515 (S.D.N.Y. 2013) (quoting Holland v. City of Poughkeepsie, 935 N.Y.S.2d 583, 589 (App. Div. 2011)).

Section 1983 claims for false arrest are "substantially the same" as false arrest claims under New York law.  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  In New York, false arrest claims require a showing that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."  Id. at 853 (citations omitted); see also Pelayo v. Port Auth., 893 F. Supp. 2d 632, 639 (S.D.N.Y. 2012).

9

An arrest of a criminal suspect by a law enforcement officer with probable cause is a "privileged" confinement even if it is non-consensual.  Decker v. Campus, 981 F. Supp. 851, 856 (S.D.N.Y. 1997).  Thus, for arrests by law enforcement officers, "[t]he existence of probable cause to arrest constitutes a complete defense to an action for false arrest, whether that action is brought under Section 1983 or state law." Matthews v. City of New York, 889 F. Supp. 2d 418, 433 (E.D.N.Y. 2012) (citation and internal quotation marks omitted); see also Weyant, 101 F.3d at 852; Biswas, 973 F. Supp. 2d at 515.

An officer has probable cause for an arrest when at the time of the arrest "the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964) (citation omitted); see also Garrett v. City of New York, No. 10cv2689, 2011 WL 4444514, at *4 (S.D.N.Y. Sept. 26, 2011).  Once the fact of a warrantless arrest has been established, the burden is on the arresting officer to prove probable cause for the arrest by a preponderance of the evidence.  Garrett, 2011 WL 4444514, at *4.

Even if an officer did not have probable cause for an arrest, the officer may still be shielded from liability for false arrest under the doctrine of qualified immunity. Qualified immunity protects government officials performing discretionary functions, such as arrests, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014); Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009); Malley v. Briggs, 475 U.S. 334, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). "Requiring the alleged violation of law to be clearly established balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Wood v. Moss, 134 S. Ct. 2056, 2067 (2014) (citation and internal quotation marks omitted). As the Supreme Court has explained, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001) (citation omitted),

overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).

In the case of an arrest, an officer is entitled to qualified immunity if he had "arguable probable cause" to make the arrest, which means that "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010) (citation omitted). "'[A]rguable probable cause' . . . focus[es] attention on the word 'clearly' established law, and [shields an] officer[ from liability] if reasonable officers could disagree as to what the law is." Torraco v. Port Auth., 539 F. Supp. 2d 632, 651 (E.D.N.Y. 2008), aff'd, 615 F.3d 129 (2d Cir. 2010).


A.

In this case, Defendant Perez arrested the plaintiff for trespass, a violation under New York Penal Law § 140.05. Under the statute, "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." N.Y. Penal Law § 140.05. A person is licensed or privileged to enter or remain on premises that are "open to the public" unless that person "defies a lawful order not to enter or remain" on the

12

premises.  Id. § 140.00(5).  It is undisputed that the plaintiff
had not received a lawful order "not to enter or remain" on the
premises at 105 Charles Street when Perez encountered him there.
Thus, the question of whether he was trespassing at the time of
his arrest turns on whether the vestibule where he was found was
"open to the public."  The parties dispute the meaning of this
term and its applicability to the premises on which the
plaintiff was arrested.

There is no bright-line rule for determining when premises
are "open to the public" under the meaning of the New York
trespass statute.  See Davis v. City of New York, 373 F. Supp.
2d 322, 332 (S.D.N.Y. 2005).  New York courts have looked to a
number of factors, including:

> the type of building involved; who owned the building;
> whether such ownership was posted or advertised; the
> physical condition and general appearance of the building;
> the purpose, if any, for which it was being used; whether
> members of the public were expressly or impliedly invited
> to enter; whether the public moved freely in and out of the
> building; whether doors and windows of the building were
> intact and were closed, locked or blocked; and whether any
> warning signs were conspicuously posted; as well as any
> other evidence which might have some bearing on the[]
> determination in this regard.

Mitchell v. City of New York, No. 12cv2674, 2014 WL 535046, at
*4 (S.D.N.Y. Feb. 11, 2014) (quoting People v. Taylor, 452

13

N.Y.S.2d 526, 528-29 (Sup. Ct. 1982))[3]; see also People v. Scott, 797 N.Y.S.2d 847, 850 (Crim. Ct. 2005) ("[T]he test must be whether in light of common experience it is understood that the area is not open to the general public.").

When viewed in the light most favorable to the plaintiff, the record in this case indicates that the plaintiff was sitting with his eyes closed on the floor of a vestibule of an apartment building with an unlocked door and no "no trespassing" sign posted when Defendant Perez and an unspecified number of other officers encountered him.  When questioned, the plaintiff said that he had been "hanging out with a girl" who lived in the next building.  (McKay Dep. at 8.)  The defendants argue that under the totality of the circumstances, it was objectively reasonable for Perez to have concluded that the vestibule in which he found the plaintiff was not "open to the public" at the time of the arrest.  The plaintiff argues that no reasonable officer could conclude that an unlocked vestibule without a posted "no trespassing" sign is closed to the public.[4]

-----

[3] While the plaintiff argued that the Taylor factors have been legislatively overruled, there is no basis for that assertion. The definition of "enter or remain unlawfully" in New York Penal Law § 140.00(5) has not been changed since Taylor was decided, and the Taylor factors were recently relied upon in Mitchell.

[4] The plaintiff also argues that the 911 call alleged by the defendants to have been the reason why the officers responded to the scene of 105 Charles Street was fabricated as a pretext for

New York courts have generally considered common areas of residential apartment buildings to be "closed to the public" if they are behind locked doors or if they contain posted "no trespassing" signs.  See, e.g., People v. Babarcich, 561 N.Y.S.2d 255, 256 (App. Div. 1990) ("[T]he officer was justified in concluding that the defendant in fact had no privilege to be on the premises of the apartment complex which, in light of the 'no trespassing' sign, the officer reasonably considered as being closed to the general public."), appeal denied, 76 N.Y.2d 1019 (1990); People v. Torres, 556 N.Y.S.2d 920, 921 (App. Div. 1990) (finding that an officer was reasonable in concluding that a hallway was not "open to the public" where "[t]he apartment building in question . . . was locked at the front door and . . . [t]here was also a 'No Trespassing' sign in both English and Spanish posted at the entrance"), appeal denied, 76 N.Y.2d 895 (1990).  By the same token, where these features are absent, common areas such as lobbies, hallways, and vestibules are often viewed as "open to the public."  See, e.g., People v. Outlar, 677 N.Y.S.2d 430, 433 (Crim. Ct. 1998) ("The information does not allege defendant passed through a locked door, a buzzer

arresting the plaintiff.  However, the plaintiff has presented no evidence to respond to the evidence of the 911 call.  (See Zimmerman Decl. ¶ 5 & Ex. D.)  In any event, probable cause is based on what the arresting officer knew at the time of the arrest, Garrett, 2011 WL 4444514, at *4, and Defendant Perez's personal observations were consistent with the 911 call.

and intercom system, or any other physical separation or barrier that would suggest the hallway was closed to the public . . . . An allegation that defendant was in the hallway, without any indication he entered through a locked entrance, is insufficient to support an unlawful entry charge." (collecting cases)).

On the other hand, some New York cases have not viewed the presence or absence of a locked door or a "no trespassing" sign as dispositive of whether premises are "open to the public." Rather, such courts have looked to all of the characteristics of the premises involved and the circumstances of the alleged trespasser's presence upon the premises—including the purpose for which the premises are being used, whether members of the public are expressly or impliedly invited to enter, and whether the alleged trespasser is present for a purpose for which the public is impliedly licensed to enter. Thus, in Scott, the court found that the unlocked lobbies of apartment buildings behind unlocked vestibules were

> not necessarily open to the general public.  The residents of an apartment building . . . are entitled to expect that common areas of their homes are open only to people with a legitimate reason for entering.  Such people include (but are not necessarily limited to) residents, guests of residents, deliverymen, and friends and relatives of residents who have been told by residents that they are welcome to visit without a specific invitation.  But the lobby of an apartment building is not a place open to anybody who is there for no legitimate reason at all.

16

797 N.Y.S.2d at 850.  The court specifically disagreed with
cases that had concluded that "a lock, 'no trespass' sign, or
some 'physical barrier' is necessary to give the general public
fair notice that it is unwelcome in the lobby of an apartment
building."  Id. at 851 (citation omitted).[5]  Other cases,
similarly, have not viewed the presence or absence of locked
doors or "no trespassing" signs as dispositive of whether
premises are open to the public.  See People v. Jiminez, 880
N.Y.S.2d 226, at *1 (Sup. Ct. App. Term 2008) (per curiam)
(noting that the defendant was found in the vestibule of a
building indiscriminately ringing buzzers and that he could not
identify whom he was visiting, and concluding on this basis,
without mentioning whether the door was locked or a "no
trespassing" sign was posted, that the vestibule was not "open
to the public"); People v. Rodriguez, 552 N.Y.S.2d 13, 14 (App.
Div. 1990) (finding that it was reasonable to conclude that a
stairwell was not open to the general public when it was behind
two closed doors, but making no mention of locks or "no
trespassing" signs), appeal denied, 76 N.Y.2d 742 (1990).

---

[5] While there were "no trespassing" signs in each of the four
criminal complaints at issue in Scott, the court plainly did not
find the presence of those signs to be a dispositive factor.
The court also noted in dicta that a "lobby through which one
must walk to reach a store or a buzzer system would not be
private."  Id. at 851.  However, the court had no occasion to
consider whether such a lobby would be open to the public for a
purpose other than a plainly intended use.

In People v. Powell, the Court of Appeals concluded that a defendant who had been apprehended in a private office building after business hours was not on premises "open to the public," even though the front door was unlocked.  448 N.E.2d 797, 797-98 (N.Y. 1983).  The Court concluded that a jury could find from the evidence that, although the defendant's entry was licensed, the defendant "was not licensed to remain because it was apparent . . . from the time of the day and the absence of any persons in the reception area or individual offices that the building was not 'at the time open to the public.'"  Id. at 798.  Although Powell lends some support to the view that an unlocked common area without a "no trespassing" sign can be closed to the public for purposes of the trespass statute, the premises and factual circumstances are very different from those involved in this case.

The New York Court of Appeals has not otherwise interpreted the phrase "open to the public" under § 140.00(5) in any relevant context, and it has not resolved the tension among courts that have disagreed about the significance of locked doors and "no trespassing" warnings in determining whether premises are "open to the public."  Compare Scott, 797 N.Y.S.2d at 850, with Outlar, 677 N.Y.S.2d at 433.

B.

Ultimately, this uncertainty in the meaning of the term "open to the public" in the New York trespass statute requires a finding that Defendant Perez is entitled to qualified immunity, and that the false arrest claim against him must be dismissed. In order to overcome a qualified immunity defense, a plaintiff must show that, taken in the light most favorable to the plaintiff, the facts alleged indicate that the officer's conduct violated a constitutional right, and that the right allegedly violated was "clearly established."  See Saucier, 533 U.S. at 201.

In this case, there is no question that the plaintiff had a right not to be arrested without probable cause; this principle of constitutional law is clearly established.  See Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997). However, the Supreme Court has emphasized that the inquiry into whether the governing law was clearly established must be undertaken at a more granular level.  See Saucier, 533 U.S. at 201 ("This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."); Anderson v. Creighton, 483 U.S. 635, 641 (1987) ("The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have

19

believed [the] warrantless search to be lawful, in light of
clearly established law and the information the searching
officers possessed."); see also Chipperini v. Crandall, 253 F.
Supp. 2d 301, 307-09 (D. Conn. 2003) (noting that the inquiry
into clearly established law in the context of a warrantless
arrest required an analysis of the state criminal statute that a
plaintiff-arrestee was suspected by her arresting officers of
having violated).  Law is "clearly established" for qualified
immunity purposes if "various courts have agreed that certain
conduct is a constitutional violation under facts not
distinguishable in a fair way from the facts presented in the
case at hand . . . ."  Saucier, 533 U.S. at 202.

New York courts are not in agreement as to the meaning of
the phrase "open to the public" in the context of common areas
of residential buildings.  Some courts have concluded that
premises could be "open to the public" for certain purposes, but
not others.  See Jiminez, 880 N.Y.S.2d, at *1; Scott, 797
N.Y.S.2d at 850.  Under these cases, an officer could reasonably
conclude that a vestibule is not "open" to someone who uses it
as a place to sleep or rest, even if it could be "open" for
other purposes, such as using an intercom system, waiting to
visit a resident, or delivering a package.  On the other hand,
some courts have employed a less flexible test, concluding that
in the absence of locked doors or "no trespassing" signs, a

defendant has a license to remain on premises until the defendant receives a lawful order to leave.  See, e.g., Outlar, 677 N.Y.S.2d at 433.  Under these cases, a defendant who is found in a hallway or vestibule without any indication that he passed by a locked door or a "no trespassing" sign is not trespassing.

The New York Court of Appeals has not defined the phrase "open to the public" in factual circumstances similar to this case, and the cases proffered by the parties do not establish whether there was probable cause for the plaintiff's arrest. The cases nevertheless do provide a basis for reasonable officers to disagree as to whether there was probable cause to arrest the plaintiff for trespass.  Accordingly, there was arguable probable cause to arrest the plaintiff.  Cf. Campbell v. Peters, 256 F.3d 695, 701-02 (7th Cir. 2001) (noting that for purposes of an Eighth Amendment claim under § 1983, a lack of opinions from the state courts as to the meaning of a state statute limiting the term of prison sentences required a finding of qualified immunity); Torraco, 539 F. Supp. 2d at 651 (finding the defendants entitled to qualified immunity because reasonable officers could disagree about the meaning of a federal statute that was argued to have shielded the plaintiff-arrestee from criminal liability).  Defendant Perez is therefore entitled to

qualified immunity, and his motion for summary judgment on the

plaintiff's false arrest claim must be granted.[6]


                              IV.

     The plaintiff also brings a claim for malicious

prosecution.  On June 21, 2012, Defendant Perez signed a

_____

[6] Until recently, the Supreme Court had required a court
considering a qualified immunity defense to address whether a
constitutional violation had occurred before proceeding to the
determination of whether a reasonable officer in the defendant's
position should have known that he was violating the plaintiff's
clearly established rights.  See Pearson, 555 U.S. at 232
(discussing the approach mandated by the Supreme Court in
Saucier, 533 U.S. 194).  In Pearson, the Supreme Court held that
under certain circumstances, a court addressing a qualified
immunity defense could forgo the inquiry into whether a
constitutional violation had actually occurred and proceed
directly to the question of whether a reasonable officer in the
defendant's position should have known he was violating the
plaintiff's clearly established constitutional rights.  555 U.S.
at 236.  One such set of circumstances occurs when a court can
"rather quickly and easily decide that there was no violation of
clearly established law before turning to the more difficult
question whether the relevant facts make out a constitutional
question at all."  Id. at 239.  Another such set of
circumstances occurs when a constitutional decision would rest
on an "uncertain interpretation of state law."  Id. at 238.  In
this case, both rationales for avoiding the constitutional
question are present.  A determination of whether there was
actual probable cause for the plaintiff's arrest would require
an uncertain interpretation of state law.  Further, it is
readily apparent that there was no violation of clearly
established law because the defendant officer's belief that the
plaintiff was trespassing has some support in state case law.
There is therefore no requirement to reach the question of
whether Perez had actual probable cause to believe that the
plaintiff was trespassing.

criminal complaint charging the plaintiff with criminal trespass in the second degree, a class A misdemeanor under New York Penal Law § 140.15.  The plaintiff then made five court appearances pursuant to this charge before the complaint was dismissed on speedy trial grounds.  The defendants argue that the record does not establish the lack of probable cause, actual malice, or a deprivation of liberty that amounts to a seizure under the Fourth Amendment, and that therefore the claim for malicious prosecution against Perez must be dismissed.

To establish a claim for malicious prosecution under § 1983, a plaintiff must establish the elements of a malicious prosecution claim under New York state law, as well as a violation of the plaintiff's rights under the Fourth Amendment. Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010).  A claim for malicious prosecution under New York state law requires "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Id. at 161 (internal citation and quotation marks omitted).  A claim for malicious prosecution under § 1983 requires the additional element of "(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  Rohman v. N.Y. City

Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000); Perez, 962 F.
Supp. 2d at 540.

The defendants argue that because Defendant Perez had
probable cause to arrest the plaintiff, he also had probable
cause to initiate the prosecution against him, and the plaintiff
therefore cannot establish that probable cause to initiate his
prosecution was lacking.  The existence of probable cause is a
complete defense to a claim of malicious prosecution in New
York.  Manganiello, 612 F.3d at 161-62; Cooper v. City of New
Rochelle, 925 F. Supp. 2d 588, 611 (S.D.N.Y. 2013).  Indeeed, "a
malicious prosecution claim will be defeated by a finding of
probable cause to arrest, unless the plaintiff can demonstrate
mitigating facts to vitiate probable cause which were first
uncovered after the arrest."  Carson v. Lewis, 35 F. Supp. 2d
250, 263 (E.D.N.Y. 1999) (citation omitted); see also Cooper,
925 F. Supp. 2d at 611; Dukes v. City of New York, 879 F. Supp.
335, 342 (S.D.N.Y. 1995).

Similarly, an officer is entitled to qualified immunity
against a claim of malicious prosecution if the officer had
arguable probable cause to arrest the plaintiff.  See Betts v.
Shearman, 751 F.3d 78, 83 (2d Cir. 2014).  "[B]ecause the focus
of the qualified immunity inquiry is on the objective
reasonableness of the defendant's actions, motivation does not

come [into] play" when there is arguable probable cause.  Bonide
Prods., Inc. v. Cahill, 223 F.3d 141, 146 (2d Cir. 2000) (per
curiam) (citation omitted).  Thus, an officer who is objectively
reasonable in believing he has probable cause to arrest is
entitled to qualified immunity on a claim for malicious
prosecution "regardless of [any] allegations of malicious
motivation," id., as long as the officer does not learn of facts
after the arrest "that would negate his . . . earlier
determination of probable cause."  Cooper, 925 F. Supp. 2d at
611.

     In this case, Defendant Perez had arguable probable cause
to arrest the plaintiff for trespass, and he therefore had
arguable probable cause to initiate a prosecution for trespass
against the plaintiff unless he learned facts at some point
after the arrest that would negate any objectively reasonable
basis for probable cause.[7]  The record yields a reasonable

---

[7] The plaintiff was arrested for trespass, a violation under New
York Penal Law § 140.05, and was later charged in the criminal
complaint with criminal trespass in the second degree, a class A
misdemeanor under New York Penal Law § 140.15.  These two
provision differ only in that § 140.05 requires a defendant to
have "knowingly enter[ed] or remain[ed] unlawfully *in or upon
premises*," whereas § 140.15 requires a defendant to have
"knowingly enter[ed] or remain[ed] unlawfully *in a dwelling*."
N.Y. Penal Law §§ 140.05 & 140.15 (emphasis added).  It is
undisputed that the premises where the plaintiff was found
constituted a dwelling, and the difference between the offense
of arrest and the offense for which the plaintiff was prosecuted
is therefore immaterial for present purposes.

inference that Perez undertook some form of investigation into the trespass charge after the arrest.  However, there is no indication that Perez learned of any facts that would undermine the existence of arguable probable cause based on his personal observations at the time of the arrest.  The criminal complaint added a couple of items of information, the veracity of which is disputed, and which, if true, would have supported probable cause rather than undermining it.  For example, the criminal complaint alleges that there was a "no trespassing" sign.  The criminal complaint also alleges that the arresting officer was informed by an agent of the owner of the apartment building at 105 Charles Street that the plaintiff did not have permission or authority to enter or remain in the area in which the plaintiff was found.  While the agent subsequently affirmed the truth of that statement, the agent denied ever giving the statement to a police officer.  Eliminating this additional information would still leave Perez with arguable probable cause to have arrested the plaintiff and to have signed a criminal complaint.  The plaintiff does not point to any other facts that Perez might reasonably have come to know in the period between the arrest and the initiation of the prosecution that could have undermined the existence of arguable probable cause.  Accordingly, Perez had arguable probable cause to initiate a prosecution for trespass against the plaintiff.

26

Because Perez had arguable probable cause to initiate the prosecution against the plaintiff for trespass, there is no occasion to reach the question of whether the prosecution was motivated by malice, see Bonide Prods., 223 F.3d at 145 ("As it was objectively reasonable for [the officer] to believe that he had probable cause to [initiate proceedings] against [the plaintiff], we need not consider the other elements of the malicious prosecution claim."), and no occasion to resolve the dispute between the parties as to whether the court appearances made by the plaintiff amounted to a seizure.  See Cooper, 925 F. Supp. 2d at 611 ("The existence of probable cause is a complete defense to a claim of malicious prosecution in New York." (citation omitted)).  Perez has established that he is shielded by qualified immunity from liability on the malicious prosecution claim, and the malicious prosecution claim against him must therefore be dismissed.


V.

The plaintiff also alleges claims against former Police Commissioner Raymond Kelly, former Mayor Michael Bloomberg, and the City.  The defendants argue that there is insufficient evidence in the record to raise a material issue of fact as to the personal involvement of Defendants Kelly and Bloomberg in

27

the alleged constitutional violations, and also insufficient evidence to establish that a municipal policy or custom caused the plaintiff's alleged injuries.

A.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 122 (2d Cir. 2004) (citation omitted); see also Hollins v. City of New York, No. 10cv1650, 2014 WL 836950, at *12 (S.D.N.Y. Mar. 3, 2014).  The plaintiff alleges that Defendants Kelly and Bloomberg were personally involved in the alleged constitutional violations by establishing a policy of using boilerplate language for trespass complaints.  While it is true that the personal involvement of a supervisory official can be established by showing that the official created a "policy or custom under which unconstitutional practices occurred," Hollins, 2014 WL 836950, at *13, there is no evidence in the record to support the allegation that a policy created by Kelly or Bloomberg had anything to do with the arrest or prosecution of the plaintiff.

With respect to the false arrest claim, the use of boilerplate language in a criminal complaint is irrelevant,

because the alleged unconstitutional seizure occurred prior to the filing of the criminal complaint and therefore could not have been caused by it.  See, e.g., Kia P. v. McIntyre, 235 F.3d 749, 761 (2d Cir. 2000) ("In all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." (citation omitted)).

With respect to the malicious prosecution claim, the plaintiff alleges that Defendant Perez used boilerplate language in the criminal complaint pursuant to the "Trespass Affidavit Program" because Perez was operating under the mistaken view that the building at 105 Charles Street was participating in the program, and that this caused Perez to include information in the criminal complaint that was false.  However, while Perez may have filled in or signed a form complaint, there is no evidence to suggest that Kelly or Bloomberg was responsible for establishing a policy of using such forms, or that such a policy included using false information to complete the form. Accordingly, there is no evidence to support the personal involvement of either Kelly or Bloomberg in the alleged constitutional violations, and the claims against these defendants must be dismissed.  See, e.g., Brocuglio v. Proulx, 324 F. App'x 32, 35 (2d Cir. 2009) (summary order); Hopkins v. DeStefano, No. 07cv1742, 2009 WL 4349535, at *11 (D. Conn. Nov.

25, 2009); Younger v. City of New York, 480 F. Supp. 2d 723, 733
(S.D.N.Y. 2007).


                              B.

     The plaintiff also brings his claims against the City.  To
impose § 1983 liability upon a municipality, a plaintiff must
identify a municipal "policy" or "custom" that caused the
plaintiff's injuries.  See Monell v. Dep't of Soc. Servs., 436
U.S. 658, 694 (1978); see also Bd. of Cnty. Comm'rs v. Brown,
520 U.S. 397, 403 (1997); Sorlucco v. N.Y. City Police Dep't,
971 F.2d 864, 870 (2d Cir. 1992); Bullard v. City of New York,
240 F. Supp. 2d 292, 299-300 (S.D.N.Y. 2003).  The plaintiff
must demonstrate that the municipality was the "moving force"
behind the injuries alleged.  Brown, 520 U.S. at 404; Monell,
436 U.S. at 694.  The alleged policy does not need to be
contained in an explicitly adopted rule so long as the unlawful
practices of city officials are so "persistent and
widespread . . . as to constitute a custom or usage with the
force of law."  Sorlucco, 971 F.2d at 870-71 (citation and
internal quotation marks omitted); see also Munoz v. City of New
York, No. 04cv1105, 2008 WL 464236, at *3 (S.D.N.Y. Feb. 20,
2008).

                              30

The claims against the City must be dismissed because the plaintiff has submitted no evidence that any municipal policy or custom was the moving force behind the plaintiff's arrest or prosecution.  The plaintiff alleges that Defendant Perez's mistaken belief that the building at 105 Charles Street was part of the "Trespass Affidavit Program" caused Perez to use boilerplate language in the criminal complaint that otherwise would not have been included.  However, with respect to the false arrest claim, any such policy could not have been the moving force behind the alleged constitutional deprivation because the plaintiff's arrest occurred prior to the filing of the criminal complaint.  See Jones v. Town of East Haven, 691 F.3d 72, 80-81 (2d Cir. 2012) ("It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (citation and emphasis omitted)).  Moreover, there is no evidence in the record from which to infer that there was any policy of providing false information in criminal complaints, or that the use of form complaints was the moving force behind the plaintiff's prosecution.  See, e.g., Bowen v. Cnty. of Westchester, 706 F. Supp. 2d 475, 488 (S.D.N.Y. 2010) ("[A] single instance of employee misconduct does not state a Monell claim." (collecting

31

cases)).  Accordingly, the claims against the City must be dismissed.


CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, the defendants' motion for summary judgment dismissing all causes of action in the Complaint is **granted.** The Clerk is directed to **close all pending motions**, to **enter Judgment,** and to **close this case**.

**SO ORDERED.**

**Dated:    New York, New York**
**          July 24, 2014            _____/s/_____**
**                                    John G. Koeltl**
**                          United States District Judge**